**THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE,      )
     )
   v.      )    **I.D. No. 2201002905**
     )    **Cr. A. Nos.  IN22-02-0864, etc.**
EZEKIEL TAMBA,      )
     **Defendant.**      )

Submitted:  May 1, 2026
Decided:   July 30, 2026

*Upon Defendant Ezekiel Tamba's Motion for Postconviction Relief,*
**DENIED**.

*Upon Postconviction Counsel's Motion to Withdraw,*
**GRANTED**.

*Upon Defendant Ezekiel Tamba's Motion for Correction of Sentence,*
**DENIED**.

## ORDER

Upon consideration of Defendant Ezekeil Tamba's Motion for Postconviction Relief (D.I. 42), his supplements to that motion (D.I. 57, 63), his postconviction attorney's Motion to Withdraw with its supporting memorandum and appendix (D.I. 52-54), the response of his trial counsel to his postconviction claims (D.I. 58, 67), the State's response to his postconviction claims (D.I. 65);

And upon consideration of Mr. Tamba's Rule 35(a) Motion seeking sentence relief (D.I. 59), the State's response to his sentencing claim (D.I. 64), it appears to the Court that:

# I. PROCEDURAL BACKGROUND

(1)     After a three-day jury trial, Ezekiel Tamba was found guilty of one count of attempted first-degree murder and related weapons counts.[1]  He is currently serving an 18-year term of imprisonment for those crimes.[2]

(2)     The procedural background of Mr. Tamba's case has been outlined well by his postconviction counsel, Megan Davies, Esquire, (hereinafter "Postconviction counsel" or "PCR Counsel").[3]   Pertinent portions of that recitation are reproduced (with minimal editing) and adopted by the Court for the purpose of the present motions, as follows:

### *Arrest and indictment*

> On January 10, 2022, Ezekiel Tamba was arrested in connection to a shooting which occurred in the parking lot of a Walmart in New Castle, Delaware.  Police alleged that Mr. Tamba had followed Dacosta Harry to his vehicle where Mr. Tamba opened fire on Mr. Harry.  Mr. Tamba then fled the scene.

> A preliminary hearing took place on February 14, 2022.  The Court found, based upon the testimony of the officer, that the State had established probable cause existed and the matter was transferred to Superior Court.

> On May 9, 2022, a Grand Jury approved an Indictment, charging Mr. Tamba with:

---

[1]   D.I. 27 (Verdict Form).

[2]   D.I. 32 (Sentencing Order); D.I. 38 (Sentencing Transcript).

[3]   D.I. 53 ("PCR Counsel's Mot. to Withdraw Mem."); D.I. 54 ("PCR Counsel's App'x" [contents of that comprehensive volume were cited in PCR Counsel's memorandum and will be cited hereinafter as "A-***"].

1. Attempted Murder – First Degree
2. Possession of a Firearm During the Commission of a Felony
3. Carrying a Concealed Deadly Weapon (Firearm)
4. Resisting Arrest – A misdemeanor

The State dismissed the resisting arrest charge prior to trial.

### *Pretrial matters*

Mr. Tamba gave a custodial statement. Though he denied committing the crime, inconsistencies between his version of the events and other evidence may have been used against him at trial. On December 7, 2022, trial counsel filed a motion to suppress the statement. The motion was withdrawn on February 21, 2023, because the State agreed not to introduce Mr. Tamba's statement as a part of its case-in-chief.

\*            \*            \*

### *Trial and sentencing*

A jury trial commenced on February 27, 2023. The evidence consisted of:

- Testimony of the victim, Dacosta Harry.

- Testimony of Mr. Tamba's girlfriend, Theodosia Kollie, who was working at the Walmart on the date of the incident.

- Testimony of Jael Peralta, who was working at the Walmart on the date of the incident and who interacted with Mr. Tamba before and after the shooting.

- The recorded statement of Telyka Brooker-Parquet who observed the altercation in the Walmart parking lot and described the assailant.

- Interior and exterior Walmart surveillance video.

- Law enforcement testimony related to scene response and evidence collection.

-3-

- Testimony of a forensic nurse detailing the injuries to Mr. Harry.

During the course of trial, Ms. Brooker-Parquet became unwilling to testify. She had observed the altercation in the Walmart parking lot, and waved down a responding office to report her observations. Her statement was captured on police body worn camera. The State sought to introduce the body worn camera recording as affirmative evidence.

Trial counsel argued that admission of the statement, without Ms. Brooker-Parquet's appearance at trial, violated Mr. Tamba's right to confrontation. The Court held that the statement was not testimonial in nature and, in turn, the admission did not violate Mr. Tamba's rights under the Confrontation Clause. The recorded statement was admitted.

During the course of trial, the State alerted trial counsel to new information it obtained during witness prep. After the shooting, witnesses Ms. Peralta and Ms. Kollie were interviewed at the police station. The State proffered that, during witness prep, Ms. Peralta informed prosecutors of an exchange which occurred between she and Ms. Kollie at the station. Ms. Peralta reported that Ms. Kollie voiced concern that, if Mr. Tamba had committed the crime, he may have used her gun. Ms. Peralta stated that Ms. Kollie was in the army at the time.

The State sought to introduce the statement as a prior inconsistent statement, should Ms. Kollie deny that she had a gun in the apartment she shared with Mr. Tamba. Trial counsel objected to the statement, arguing that Ms. Kollie's alleged worry about the gun was irrelevant speculation. The trial court ruled that the testimony was admissible as a prior inconsistent statement and was relevant to showing Mr. Tamba's access to a weapon. Ms. Kollie testified that no weapons were kept in the apartment. Her purported statement to Ms. Peralta was admitted as a prior inconsistent statement.

The jury returned a guilty verdict on all counts on March 1, 2023. The Court sentenced Mr. Tamba to the minimum mandatory incarceration term of 18 years, followed by a period of probation.

*Direct Appeal*

Trial counsel, James Haley, Jr., continued to represent Mr. Tamba on appeal. Through counsel, Mr. Tamba raised two issues on appeal: (1) that the trial court abused its discretion in admitting the recorded statement of Ms. Brooker-Parquet in violation of the Confrontation Clause, and (2) that the trial court abused its discretion in allowing Peralta to testify to Ms. Kollie's prior inconsistent statement about having a gun.

On April 12, 2024, following oral argument, the Delaware Supreme Court affirmed Mr. Tamba's convictions and sentence. The Supreme Court found that the Superior Court did not abuse its discretion in admitting the evidence challenged on appeal.[4]

## II. <u>FACTUAL BACKGROUND</u>

(3)    The trial evidence and arguments were also set out well by Postconviction counsel.[5] That outline is reproduced and adopted by the Court here:

- Ms. Kollie, Mr. Tamba's girlfriend and the mother of his child, was working at the New Castle Walmart on the date of the shooting.

- Mr. Tamba arrived at the Walmart with he and Ms. Kollie's child.

- Mr. Tamba's arrival was captured on surveillance video.

- Mr. Tamba approached Jael Peralta, who was working at the customer service desk. Mr. Tamba asked Ms. Peralta to watch his child while he went to smoke a cigarette.

- Surveillance video shows Mr. Tamba at the customer service area with the baby stroller. He leaves the stroller near Ms. Peralta and exits the store.

- Ms. Peralta testified that, when Mr. Tamba did not return

---

4    PCR Counsel's Mot. to Withdraw Mem. 1-6.

5    *Id.*, 7-10.

to the Walmart, she and Ms. Kollie attempted to contact him by phone. Mr. Tamba advised that he could not return to the Walmart because of police presence, and asked that the child be brought to him.

- Ms. Peralta brought the child to Mr. Tamba, who was located across the street from the Walmart. She then agreed to drive them both to the Community Plaza Center located approximately five minutes away.

- When she reached Mr. Tamba he appeared "scared and nervous." He asked Mr. Peralta to give him a ride. She testified that, as she was driving, a police car drove by and that Mr. Tamba looked scared and "he put his seat a little bit down and just told her to keep going."

- Meanwhile, police had responded to the Walmart parking lot for reports of a man with a gun.

- Police located a moving minivan which exhibited damage to the windshield. The moving van collided with a police SUV.

- Victim Dacosta Harry was operating the van. He was found with injuries to the face and appeared very disoriented.

- Mr. Harry testified that after leaving the Walmart and getting into his minivan a male knocked on his window and fired a gun. The male then asked for money and attempted to open the car door. At this point, Mr. Harry was shot in the face and was unable to see. He managed to close and lock the door as a third shot grazed his neck. He attempted to flee in his vehicle and ultimately collided with the police car.

- Mr. Harry told police that he had never seen his attacker before. He described the attacker as a 24-25 year-old male with dark skin, wearing a black covering on his head, a black jacket and blue jeans.

- Witness Brooker-Parquet's statement was played where she described the assailant as a black male in his early twenties wearing a "puffer" coat and sunglasses.

-6-

- Mr. Harry was shown surveillance footage from inside of the Walmart, and he identified the man pushing the baby stroller as his assailant.

- Ms. Peralta identified the man in the video as Ms. Kollie's significant other.

- Ms. Kollie identified the man with the stroller as Ezekiel Tamba.

- Surveillance video from the interior and exterior of Walmart was played for the jury.

- The interior video showed Mr. Harry leaving the Walmart, with Mr. Tamba exiting almost immediately behind. The exterior video then shows both men traveling on the sidewalk towards the west side parking lot, where Mr. Harry's minivan was parked.

- The shooting itself is not captured on video, only the movement of Mr. Harry's minivan as he tried to flee the shooter.

- The State played video from the other side of the parking lot in an effort to show that no one other than Mr. Tamba could have approached Mr. Harry's vehicle to commit the shooting.

- Trial counsel raised the defense of third-party guilt.

- Trial counsel elicited testimony from Mr. Harry that he had met with a person named "Lucky" at the Walmart in order to get a phone charger.

- Trial counsel elicited testimony that an area near the Walmart exit was outside the view of cameras, and that would have been the spot where "Lucky" was situated.

- Trial counsel further elicited testimony from the lead detective that, despite learning about "Lucky" during the interview of the victim, officers never went back to obtain additional footage to determine when "Lucky" entered and exited the Walmart. Additionally, counsel brought out the fact that Mr. Harry refused to allow the police to view or download the contents of his phone –despite their request.

- In closing, the State argued that the jury could track Mr. Tamba through the video surveillance. Mr. Tamba watched Mr. Harry leave the Walmart and proceeded to follow him out of the store, leaving the baby behind. The video showed that no other person approached Mr. Harry's car. The State further argued that Mr. Tamba's behavior after the shooting pointed to guilt.

- Trial counsel argued that it was reasonable for the jury to believe that "Lucky" had committed the shooting. He argued a theory that Mr. Harry asked "Lucky" to meet him at the Walmart with a phone charger. Counsel argued that "Lucky" would have wanted money for the charger. Mr. Harry needed to get money from the Walmart checkout. "Lucky" waited for the money at Mr. Harry's van, while Mr. Harry completed his shopping. Because "Lucky" approached the van well before Mr. Harry, he was not captured on the surveillance video preserved by law enforcement. When Mr. Harry returned to the van without the agreed upon money, "Lucky" opened fire. Mr. Harry wouldn't allow police to access his phone, because he didn't want them to gather information about "Lucky."[6]

## III. MR. TAMBA'S MOTION FOR POSTCONVICTION RELIEF

(4)  As mentioned before, Mr. Haley, Mr. Tamba's appointed trial counsel, filed and prosecuted a direct appeal to the Delaware Supreme Court. Notwithstanding those efforts, Mr. Tamba's convictions and sentence were affirmed on direct appeal.[7]

(5)  Mr. Tamba then filed his first timely postconviction motion *pro se* with

---

[6]  *Id.*

[7]  *Tamba v. State*, 2024 WL 1597739 (Del. Apr. 12 2024) (*Tamba I*).

-8-

an accompanying application for counsel.[8] The Court granted his request for counsel and Postconviction counsel was appointed to represent him in this postconviction proceeding.[9]

(6) The Court provided Postconviction counsel with the opportunity to review the complete record in this matter and file an amended motion if, in her professional judgment, amendment was appropriate.[10]

(7) Postconviction counsel has now filed a Motion to Withdraw as Counsel.[11] In her motion, Postconviction counsel reports that—after thorough review of Mr. Tamba's case—she discovered no potential meritorious grounds for relief and, in turn, cannot ethically advocate any postconviction claims on his behalf.[12]

(8) Under this Court's Criminal Rule 61(e)(7):

> If counsel considers the movant's claim to be so lacking in merit that counsel cannot ethically advocate it, and counsel is not aware of any other substantial ground for relief available to the movant, counsel may move to withdraw. The motion shall explain the factual and legal basis for counsel's opinion and shall give notice that the movant may file a response to the motion within 30 days of service of the motion upon the movant.[13]

---

[8] D.I. 42 (*pro se* motion for postconviction relief); D.I. 43 (motion for appointment of postconviction counsel).

[9] D.I. 46.

[10] D.I. 51.

[11] D.I. 52-54.

[12] PCR Counsel's Mot. to Withdraw Mem. 1, 31.

[13] Del. Super. Ct. Crim. R. 61(e)(7).

(9)    Postconviction counsel provided Mr. Tamba with a copy of her withdrawal motion and advised Mr. Tamba of his ability under Rule 61(e)(7) to file a response thereto.[14]  Mr. Tamba responded to the motion to withdraw with two supplementary filings. [15]

(10)    Mr. Tamba's trial counsel, Mr. Haley, who also represented him on direct appeal, filed a response addressing Mr. Tamba's postconviction claims alleging ineffective assistance of counsel.[16]

(11)    As just mentioned, in addition to his original *pro se* motion for postconviction relief, Mr. Tamba has docketed supplements after his postconviction counsel's motion to withdraw.[17]  The Court deems those filings collectively as the response permitted by Rule 61(e)(7).

(12)    The State has filed its response opposing Mr. Tamba's postconviction motion.[18]

### IV.  RULE 61's PROCEDURAL REQUIREMENTS

(13)    To evaluate Mr. Tamba's postconviction claims, and to determine whether assigned counsel's motion to withdraw should be granted, the Court should

---

[14]    *See* PCR Counsel's Mot. to Withdraw Mem. 31; D.I 56

[15]    D.I. 57; D.I. 63.

[16]    D.I. 67.

[17]    D.I. 57; 63.

[18]    D.I. 65.

be satisfied that PCR Counsel conducted a truly conscientious examination of the record and the law for claims that could arguably support Mr. Tamba's Rule 61 motion. The Court should also conduct its own review of the record to determine whether Mr. Tamba's Rule 61 motion is devoid of any, at least, arguable postconviction claims.[19]

(14) Delaware courts must consider Criminal Rule 61's procedural requirements before addressing any substantive issues.[20] The procedural bars in Rule 61 are timeliness, repetitiveness, procedural default, and former adjudication.[21] Of these, two are relevant here.

(15) Under Rule 61(i)(4): "Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is

[19] *State v. Lindsey*, 2023 WL 2535895, at *5 (Del. Super. Ct. Mar. 16, 2023), *aff'd*, 2023 WL 8232287 (Del. Nov. 27, 2023).

[20] *Maxion v. State*, 686 A.2d 148, 150 (Del. 1996); *State v. Jones*, 2002 WL 31028584, at *2 (Del. Super. Ct. Sept. 10, 2002).

[21] *State v. Peters*, 283 A.3d 668, 680 (Del. Super. Ct. Sept. 30, 2022), *aff'd*, 2023 WL 3880124 (Del. June 7, 2023); *State v. Madison*, 2022 WL 3011377, at *2 (Del. Super. Ct. July 29, 2022), *aff'd*, 2022 WL 17982946 (Del. Dec. 29, 2022). These procedural requirements are considered on a claim-by-claim basis. *Id.* And, if any one of these bars applies to a specific claim, then the inmate must show entitlement to exception therefrom under Rule 61(i)(5). *Id.*; Super. Ct. Crim. R. 61(i)(5) (providing that Rule 61's procedural bars found (1)(1)-(4) in do not apply to a claim: that the court lacked jurisdiction; that pleads with particularity new evidence of the defendant's actual innocence; or, that application of a new rule of constitutional law made retroactive on collateral review is required.).

thereafter barred."[22]

(16) Rule 61(i)(3) bars any particular claim that could have been but was not raised at trial or on direct appeal, unless the defendant can show cause for relief from the procedural default and prejudice.[23] Generally, Rule 61(i)(3) is inapplicable to claims of ineffective assistance of counsel—which in the norm can't be raised against trial counsel on direct appeal[24] and as a practicality aren't yet ripe against appeals counsel until the resolution of direct appeal. And so, the Court usually considers those claims on their merits during postconviction proceedings.[25]

## V. MR. TAMBA'S POSTCONVICTION CLAIMS

(17) In Mr. Tamba's initial *pro se* Motion for Postconviction Relief, he raises three grounds for relief.[26] Mr. Tamba's claims have been set out well by Postconviction counsel. The Court replicates them here:

(a) "Ineffective Assistance of Counsel: Mr. Tamba claims that his attorney failed to object to Victim Dacosta Harry's identification of the shooter from surveillance footage of the

---

[22] Super. Ct. Crim. R. 61(i)(4).

[23] Super. Ct. Crim. R. 61(i)(3) ("Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows . . . [c]ause for relief from the procedural default and . . . [p]rejudice from violation of the movant's rights.").

[24] *See State v. Smith*, 2017 WL 2930930, at *1 (Del. Super. Ct. July 7, 2017); *see also Guy v. State*, 82 A.3d 710, 715 (Del. 2013) ("In a jurisdiction like Delaware, where ineffective assistance of trial counsel may not be raised on direct appeal, the first post-conviction proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective assistance claim.") (cleaned up).

[25] *State v. Martin*, 2024 WL 3273429, at *2 (Del. Super. Ct. July 1, 2024).

[26] D.I. 42.

interior of the Walmart.";

(b) "Ineffective Assistance of Counsel: Mr. Tamba claims his attorney failed to place on the record that the victim never identified Mr. Tamba as the shooter in open court."; and

(c) "Error in the admission of irrelevant testimony and testimony which violated the Confrontation Clause."[27]

In his supplement, Mr. Tamba further argues he was prejudiced by the admission of evidence including: (1) the prior inconsistent statement of Ms. Kollie; and (2) Brooker-Parquet's out-of-court statement captured on body worn camera.[28]

(18)   For the reasons explained now, Mr. Tamba's claims asserted through his motion for postconviction relief (and his supplements) are **DENIED.**

## VI.  ANALYSIS

### A. MR. TAMBA'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

(19)   A claim of ineffective assistance of counsel is reviewed under the familiar two-part *Strickland* test.[29]  Thereunder, one claiming ineffective assistance of counsel must demonstrate that: (a) his defense counsel's representation fell below an objective standard of reasonableness; and (b) there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different.[30]

---

[27]   PCR Counsel's Mot. to Withdraw Mem. 14.

[28]   D.I. 57, 63.

[29]   *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *Neal v. State*, 80 A.3d 935, 946 (Del. 2013).

[30]   *Strickland*, 466 U.S. at 694; *see also Alston v. State*, 2015 WL 5297709, at *2-3 (Del. Sept. 4, 2015).

(20) Now, "[t]he likelihood of [that] different result must be substantial, not just conceivable."[31] And while the "objective inquiry is not mathematically precise," there can only be a finding of the required prejudice "when there is a substantial likelihood—*i.e.*, a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance."[32]

(21) So, at some point for a movant to be successful under *Strickland*, the Court "must consider the totality of the evidence, and must ask if the movant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors" he alleges counsel made.[33] A movant must prove *both* deficient attorney performance *and* resulting prejudice to succeed in making an ineffective assistance of counsel claim. Failure in the first instance to prove either will doom his claim, and the Court need not address the other.[34] Put another way, "if the Court finds that there is no possibility of prejudice even if a defendant's

---

[31] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)); *see Strickland*, 466 U.S. at 693 ("It is not enough for the [postconviction movant] to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.") (citation omitted).

[32] *Baynum v. State*, 211 A.3d 1075, 1084 (Del. 2019) (citing *Harrington*, 562 U.S. at 112).

[33] *Dale v. State*, 2017 WL 443705, at *2 (Del. Jan. 31, 2017) (cleaned up).

[34] *Strickland*, 466 U.S. at 697; *Ploof*, 75 A.3d at 825 ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant") (citation omitted); *State v. Hamby*, 2005 WL 914462, at *2 (Del. Super. Ct. Mar. 14, 2005).

allegations regarding counsel's representation were true, the Court may dispose of the claim on this basis alone."[35]

(22) **Failure to Object to the victim, Dacosta Harry, identifying his shooter on the Walmart surveillance video (Ground One)**—Mr. Tamba argues that Mr. Haley was ineffective for not objecting to Mr. Harry's identification of his shooter on the Walmart surveillance video.[36] Mr. Tamba seems to believe that an objection was warranted because Mr. Harry had not previously seen the video or identified his shooter thereon.[37] Separately, Mr. Tamba argues that Mr. Haley should have objected because he believes Mr. Harry's previous description of the shooter did not match the man he identified in the video.[38] He further asserts that Mr. Haley should have objected to the prosecution "coercing" the identification from Mr. Harry by pausing the video before asking Mr. Harry if he recognized anyone.[39]

(23) Following the shooting, Mr. Harry described his assailant to the police as a male with dark skin, wearing a black covering on his head, a black jacket, and

---

[35] *State v. Manley*, 2014 WL 2621317, at *7 (Del. Super. Ct. May 29, 2014); *Green v. State*, 238 A.3d 160, 174-75 (Del. 2020) ("We may dispose of an ineffective-assistance claim based on the absence of sufficient prejudice without addressing the performance prong if, in fact prejudice is lacking."); *Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the criminal judgment if the error had no effect").

[36] Def.'s Mot. for Postconviction Relief, A-5 (D.I. 42).

[37] *Id*.

[38] *Id*.

[39] D.I. 42. Mr. Tamba raises this argument in Ground Two of his motion, but the argument substantively relates to the surveillance video identification at issue in Ground One. As such, the Court addresses it here.

blue jeans.[40] At trial, Mr. Harry testified that the shooter did not have a mask or sunglasses on.[41] The person shown in the surveillance video was a young male with dark skin, wearing a dark jacket and sunglasses, and was not wearing a head covering.[42]

(24) "When a defendant is represented by counsel, the authority to manage the day-to-day conduct of the defense rests with the attorney."[43] "Specifically, the defense attorney 'has the immediate and ultimate responsibility of deciding if and *when to object*, which witnesses, if any, to call, and what defenses to develop.'"[44]

(25) Mr. Haley's decision to not to object—informed by his thorough understanding of what the State could prove and its method of piecing together the circumstantial and direct evidence identifying the shooter[45]—to Mr. Harry's identification of the person he believed to be his shooter on the Walmart video surveillance footage was not objectively unreasonable. Mr. Haley had no basis for an objection, when at best, the inconsistency between Mr. Harry's earlier description

---

[40] PCR Counsel's Mot. to Withdraw Mem. 8.

[41] James J. Haley, Jr., Esq.'s Response to Grounds 1 and 2 of Def. Tamba's Rule 61 Filing, ¶ 12 (D.I. 67) (hereinafter "Trial Couns. Resp.").

[42] Trial Couns. Resp. ¶ 14.

[43] *Cooke v. State*, 977 A.2d 803, 840 (Del. 2009).

[44] *Id.* at 840-41 (emphasis added) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 93 (1977)).

[45] *See generally* Trial Couns. Resp. (outlining the identification evidence).

and video-identification testimony goes to the weight of the evidence, not its admissibility.[46] And Mr. Haley had decided it best to challenge the weight of the evidence and highlight such inconsistency in his closing argument.[47]

(26) Too, Mr. Tamba cannot show that he was prejudiced by Mr. Haley's failure to make a "leading" objection to the prosecution pausing the video and asking Mr. Harry questions. Had Mr. Haley objected, the Court would have overruled any such objection.[48] And even if the Court had sustained the objection, there has been no showing that it would or could have changed the outcome. The testimony of Ms. Kollie and Ms. Peralta taken with interior and exterior surveillance footage of the perpetrator before and throughout the offense established that the shooter was the man in the video and the man in the video was Mr. Tamba. Mr. Haley understood this well;[49] Mr. Harry's testimony that his shooter was the man in the video added

---

[46] *See Shelton v. State*, 744 A.2d 465, 503 n.183 (Del. 2000) ("[T]he Sixth Amendment does not require counsel to pursue meritless arguments before a court."); *Peters*, 283 A.3d at 680 ("Further, counsel cannot be ineffective for failing to make futile arguments.") (internal quotes omitted).

[47] A-426-27 ("The guy who went up and shot at Mr. Harry was not wearing sunglasses, had some kind of headware on, that's what Mr. Harry said. You'll see all the photographs, all the images of Mr. Tamba . . . no hat, no headware, anywhere. Is that really him there, or was it Lucky.").

[48] It is doubtful first that the questions then posed were "leading." *See* 1 MCCORMICK ON EVIDENCE § 6, at 27-28 (Kenneth S. Broun et al. eds., 7th ed. 2013) ("A leading question is one that suggests to the witness that answer desired by the examiner. . . . The bottom-line issue is whether an ordinary witness would get the impression that the questioner desired one answer rather than another.") Or that, had the Court found them to be so, it would have prohibited them in this instance. *Christiana Care Health Services, Inc. v. Crist*, 956 A.2d 622, 626 (Del. 2008) ("A trial judge has broad discretion in allowing leading questions of a witness, including during direct examination."); Del. R. Evid. 611(c) ("Leading questions should not be used on direct examination *except as necessary to develop the witness's testimony*.") (emphasis added).

[49] *See generally* Trial Couns. Resp.

little more.

(27) Because he demonstrates neither deficient performance nor resultant prejudice, Ground One of Mr. Tamba's ineffective assistance claim fails.

(28) **Failure to object to Mr. Harry not making an in-court identification of Mr. Tamba as his shooter (Ground Two)**—Mr. Tamba argues that Mr. Haley was ineffective for failing to object to, or place on the record, that Mr. Harry did not identify Mr. Tamba as his shooter in court.[50]

(29) Mr. Tamba's claim does not satisfy either prong of *Strickland*. Again, which questions to ask and objections or arguments to make during trial are tactical decisions left to counsel. [51] Again, Mr. Haley was wholly familiar with the identification evidence and the fact that given Mr. Harry's injuries no such in-court identification would be forthcoming—he decided it best not to risk testing Mr. Harry to do so.[52] And again, "[t]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."[53]

(30) The burden is on Mr. Tamba to show his counsel's conduct fell below an objective standard of reasonableness, "*i.e.*, that no reasonable lawyer would have

---

[50]  Def.'s Mot. for Postconviction Relief, A-6.

[51]  *Cooke*, 977 A.2d at 840-41.

[52]  Trial Couns. Resp. ¶ 17.

[53]  *Peters*, 283 A.3d at 696.

conducted the defense as his lawyer did."[54]  There is a strong presumption that his attorneys' representation was reasonable,[55] and "[i]t is not this Court's function to second-guess reasonable trial tactics."[56]  Mr. Haley explained that he deliberately chose not to ask Mr. Harry to identify Mr. Tamba in the courtroom and why he did so.[57]

(31)  Mr. Tamba is not able to overcome the strong presumption of reasonableness afforded to trial counsel's actions, nor has he—given the strength of the other identification evidence elicited—demonstrated resultant prejudice. Therefore, Ground Two of Mr. Tamba's ineffective assistance of counsel claim fails.

## B. MR. TAMBA'S IMPROPER ADMISSION OF TESTIMONY CLAIM

(32)  Mr. Tamba's contends that he was prejudiced by the admission of testimony which should have been excluded.[58]  Two issues were identified: (1) the admission of testimony of Ms. Peralta as a prior inconsistent statement of Ms. Kollie; and (2) the admission of Ms. Brooker-Parquet's statement captured on police body worn camera.[59]  As Mr. Tamba acknowledges in his papers, Mr. Haley objected to

---

[54]  *Green*, 238 A.3d at 174.

[55]  *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[56]  *State v. Drummond*, 2002 WL 524283, at *1 (Del. Super. Ct. Apr. 1, 2002).

[57]  Trial Couns. Resp. ¶ 17.

[58]  Def.'s Mot. for Postconviction Relief, A-7.

[59]  *Id.*

both at trial and litigated the propriety of their admission on direct appeal.[60]

(33)    Under Rule 61(i)(4): "Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred."[61] "Justice does not require that an issue that has been previously considered and rejected be revisited simply because the claim is refined or restated."[62]

(34)    On appeal, the Supreme Court affirmed Mr. Tamba's conviction and sentence, holding that this Court did not abuse its discretion in admitting the evidence he now challenges.[63]    Thus, Mr. Tamba's complaint regarding the admission of this evidence at trial ("Ground Three") is procedurally barred by Rule 61(i)(4).

## VII. **MR. TAMBA'S MOTION FOR CORRECTION OF SENTENCE**

(35)    While his Rule 61 application was pending, Mr. Tamba docketed a *pro se* application that he styled a "Motion to Vacate Unconstitutional Sentence and Conviction" and invoked this Court's Criminal Rule 35(a).[64]

---

[60]    *Id*., A-7-8.

[61]    Super. Ct. Crim. R. 61(i)(4).

[62]    *Riley v. State*, 585 A.2d 719, 721 (Del. 1990); *State v. Madison*, 2018 WL 1935966, at *4-5 (Del. Super. Ct. Apr. 11, 2018), *aff'd*, 2018 WL 6528488 (Del. Dec. 11, 2018).

[63]    *Tamba I*, 2024 WL 1597739, at *1.

[64]    Def.'s Mot. to Vacate Unconstitutional Sentence and Conviction (D.I. 59).

-20-

(36) Criminal Rule 35(a) permits this Court to correct an illegal sentence "at any time."[65] Relief under Rule 35(a) is available when, *inter alia*, the sentence imposed: exceeds the statutorily-authorized limits; omits a term required to be imposed by statute; is uncertain as to its substance; or, is a sentence that the judgment of conviction did not authorize.[66]

(37) Using a fill-in-the-blank form, Mr. Tamba has joined many other sentenced inmates claiming his sentence is illegal and he is due some sort of relief because of the United States Supreme Court decision in *Erlinger v. United States*.[67] But as is the case with so many of those others, *Erlinger* is of no moment in his case because not one of his three sentences was—via some statutory mechanism— enhanced in any way on either the minimum end or at the maximum end.[68]

(38) Mr. Tamba was sentenced as follows: for Attempted Murder First

---

[65] Super. Ct. Crim. R. 35(a) ("*Correction of sentence.* -- The court may correct an illegal sentence at any time . . .").

[66] *Brittingham v. State*, 705 A.2d 577, 578 (Del. 1998).

[67] *See State v. Deputy*, __ A.3d __, __, 2026 WL 1883839, at *1 (Del. Super. Ct. June 29, 2026) (observing that "scores of incarcerated Delaware defendants who had previously been convicted and sentenced under statutes incorporating recidivist enhancements began incanting *Erlinger* [*v. United States* 602 U.S. 821 (2024)] as a basis for relief from their convictions or sentences"); *see also State v. Morrison*, 2025 WL 1431931, at *2 (Del. Super. Ct. May 19, 2025) (citing *State v. Archy*, 2025 WL 1330215, at *2 (Del. Super. Ct. May 7, 2025) which made note of the "blizzard of *pro se* pleadings from inmates seeking relief" through resort to *Erlinger*).

[68] *See Deputy*, 2026 WL 1883839, at *1 n.7 (noting that "as oft happens in like circumstances, there have been a raft of filings spouting *Erlinger* where *Erlinger* is wholly inapplicable because there had been no increase in the statutorily-prescribed range of penalties in the inmates' cases") (listing cases).

Degree (IN22-02-0864)—15 years at Level V; for PFDCF (IN22-02-0865)—25 years at Level V, suspended after 3 years for terms of Level IV and III supervision; and for Carrying a Concealed Deadly Weapon (CCDW-Firearm) (IN22-05-0418)— 1 year at Level V, suspended in whole for Level II supervision.[69] So, each individual segment and the cumulation of Mr. Tamba's sentence—requiring that he serve 18 years of imprisonment—is well within the baseline minimum and maximum incarcerative terms the relevant statutes required.[70] Simply put, *Erlinger* does not apply in this case because there was no enhancement of any one of Mr. Tamba's sentences based on prior conviction history.[71]

## VIII. **CONCLUSION**

(39) Having reviewed the record carefully, the Court has concluded that Mr. Tamba's claims are without merit and no other substantial grounds for Rule 61 relief exist.[72]

(40) Accordingly, Mr. Tamba's Motion for Postconviction Relief is

---

[69] D.I. 32 (Sentencing Order). The Level V terms are to be served consecutively. *Id*.

[70] *See* DEL. CODE ANN. tit. 11, §§ 636, 531, and 4205(b)(1) (2021) (attempted first-degree murder is a class A felony carrying a statutory minimum of 15 years at Level V); *id*. at §§ 1447A(c) and 4205(b)(2) (PFDCF is a class B felony carrying a "minimum sentence of 3 years" and a ceiling of "up to 25 years to be served at Level V"); *id*. at §§ 1442(b) and 4205(b)(4) (CCDW-Firearm is a class D felony with an 8-year statutory maximum).

[71] *See State v. Northern*, 2026 WL 296289, at *1 (Del. Super. Ct. Feb. 4, 2026); *Wheeler v. State*, 2025 WL 3296176 (Del. 16, 2025); *Johnson v. State*, 2025 WL 2452107, at *2 (Del. Aug. 25, 2025).

[72] Del. Super. Ct. Crim. R. 61(e)(7); *Lindsey*, 2023 WL 2535895, at *5.

**DENIED** and Mr. Davies's Motion to Withdraw is **GRANTED**.

(41)   What's more, there is no demonstrable illegality in the substance of Mr. Tamba's sentence.  Thus, he is due no relief under this Court's Criminal Rule 35(a) and his motion thereunder must be **DENIED.**

**SO ORDERED,**

*/s/ Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary

cc:   Ezekiel Tamba, *Pro se*
       Megan Davies, Esquire
       William H. Leonard, Deputy Attorney General
       Alexandra L. LeRoy, Deputy Attorney General
       Andrew J. Vella, Deputy Attorney General
       James J. Haley, Jr., Esquire